IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLAUDIA L. FOLORUNSO, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-04-3183 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner, Social | § | |
| Security Administration, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, under 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry # 4).  Before the court are competing motions for summary judgment, which were filed by Plaintiff Claudia Folorunso ("Plaintiff," "Folorunso") and Defendant Jo Anne B. Barnhart, in her capacity as Commissioner of the Social Security Administration ("Defendant," "the Commissioner").  (Motion For Summary Judgment ["Plaintiff's Motion"], Docket Entry # 10; Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ["Plaintiff's Memo"] Docket Entry #11; Defendant's Motion For Summary Judgment ["Defendant's Motion"], Docket Entry #12; Defendant's Memorandum in Support of Motion for Summary Judgment and in Response to Plaintiff's Motion for Summary Judgment ["Defendant's Memo"], Docket Entry # 13).  Defendant responded to Plaintiff's motion, and Plaintiff has replied.  (Defendant's Memo; Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment ["Plaintiff's Reply"], Docket Entry # 14).  After considering the motions, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be DENIED, and that Defendant's motion be GRANTED.

**Background**

Folorunso filed this lawsuit, pursuant to § 205(g) of the Social Security Act ("the Act") (codified as

amended at 42 U.S.C. § 405(g)(1994)), on August 9, 2004.  ( Complaint ["Complaint"], Docket Entry # 3).

In this action, she appeals the Commissioner's decision to deny her claim for Disability Insurance Benefits

("DIB") under Title II of the Act.  (*Id.*).  Folorunso asks this court to reverse that decision, and to render a

judgment in her favor.  Alternatively, she asks that the matter be remanded to the Commissioner for further

consideration.  (*Id.*).  Plaintiff asks for this relief for several reasons.  First, she argues that the administrative

law judge ("ALJ") erred by failing to properly consider the severity, or the functional impact, of her obesity.

(Plaintiff's Memo at 4).  Second, Plaintiff argues that the ALJ erred when he concluded that she willfully

failed to follow her prescribed treatment, in violation of S.S.R. 82-59, then relied on this conclusion, in part,

to deny her benefits.  (*Id.* at 7).  Third, she argues that the ALJ erred by failing to consider the combined

impact of the recurrent abscesses and yeast infections attendant to her primary impairment, diabetes.  (*Id.*).

For her part, however, Defendant insists that the ALJ followed all of the proper procedures in evaluating the

evidence, and that his decision is supported by the  record.  For those reasons, she contends that the ALJ's

decision is proper, and that no reversal or remand is justified in this instance.

Plaintiff filed her application for DIB benefits on July 23, 2002. (Tr. at 61).  In a "Disability Report"

that she completed for the Social Security Administration ("SSA"), she claimed that she had been unable to

work since February 15, 2002, due to diabetes and high blood pressure.  (Tr. at 77).  Folorunso's request for

benefits was denied on September 12, 2002.  (Tr. at 25).  Three weeks later, she asked that the SSA reconsider

that decision.  (Tr. at 32).  On October 17, 2002, the SSA again evaluated the medical evidence that Plaintiff

had submitted with her application, but concluded that the determination to deny her claim was "proper under

the law."(Tr. at 34).  She then requested a hearing before an ALJ. (Tr. at 38).

On January 29, 2004, ALJ Larry C. Marcy reviewed Folorunso's claims *de novo.* She was represented

by an attorney at a hearing before him, and she testified in her own behalf. (Tr. at 543-44).  The ALJ also

heard from Caroline Fisher, a vocational expert witness ("VE"), and from Dr. Giao Hoang, a medical expert

witness.  (*Id.*).  In addition to the testimony, the ALJ reviewed medical records from Ben Taub Hospital and

the Harris County Hospital District.  (Tr. at 122-413, 414-521).  There were no records from any treating or examining physicians.  The ALJ also had the results of a physical residual capacity assessment, which had been completed by Dr. Grethe Z. Wik, on behalf of the SSA. (Tr. at 114).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.     An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20C.F.R. §§ 404.1520(d) and 416.920(d).

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.     If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Folorunso has the burden to prove any disability that is relevant to the first four steps.  *Wren*, 925 F.2 at 125; *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001)*; Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992)(quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming benefits under the Act has the burden to prove that she suffers

from a disability.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled, under the Act, only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983; 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "[she] is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 423(d)(2)(A)).

On February 26, 2004, the ALJ issued a written decision denying Folorunso's claim.  Based on the applicable legal principles, and the evidence before him, the ALJ determined that Folorunso suffers from "diabetes, hypertension, and abscess[es]."  (Tr. at 14).  Although he found that these conditions are "severe," he concluded, ultimately, that none of these meet, or equal in severity, the medical criteria for any disabling impairments listed in the relevant Social Security Regulations.  (*Id.*).  Based on those findings, the ALJ concluded, at step five of his analysis, that although Folorunso is unable to perform her past work, and she has acquired no transferable skills, she has the residual functional capacity to perform a full range of sedentary work.  (Tr. at 18).  For that reason, the ALJ found that Folorunso was "not under a 'disability' as defined in the Social Security Act."  (*Id.*).

Following the ALJ's decision, Plaintiff asked the SSA Appeals Council ("Appeals Council") to

4

review his conclusion.  (Tr. at 7).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances are present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970, 416.1470.  On June 4, 2004, after considering the applicable regulations, the evidence submitted, and Plaintiff's contentions, the Appeals Council concluded that there was "no reason" to grant Folorunso's request for a review.  (Tr. at 3).  Accordingly, the ALJ's findings became final, and it is that decision which Plaintiff has appealed to this court under 42 U.S.C. § 405(g).

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the Commissioner used proper legal standards to evaluate the evidence.  *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In this instance, the ALJ found that, although Folorunso "is unable to perform her past relevant work" as a home health care provider, "there are jobs, existing in significant numbers in the national economy,

which claimant is able to perform." (Tr. at 17).  He determined, specifically, that she "could lift and carry 10 pounds frequently," could "stand for 2 hours in an 8-hour day," and could sit, given "normal breaks," for an eight hour day. (Tr. at 16).  Considering these limitations, he concluded that, with her exertional capacity, age, education, and work experience, Plaintiff can perform the full range of sedentary work, and so she is "not disabled" under the statute and guidelines. (*Id.*).  Plaintiff contends, however, that the ALJ erred in reaching that conclusion because, among other things, he did not give proper consideration to either the severity of her obesity or the impact of that condition on her ability to perform work activities. (Plaintiff's Memo at 4).  She also complains that the ALJ was wrong in concluding that she did not follow her prescribed treatment, and denying her claim on that basis. (*Id.* at 7).  Finally, Plaintiff argues that the ALJ failed to consider the implications of her "draining abscesses" and "recurrent pruritic yeast infections," complications from her diabetes, on her ability to pursue employment. (*Id.*).  In response, the Commissioner contends that the ALJ followed all of the proper procedures in determining whether Folorunso was disabled.

In evaluating these arguments, the court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards were applied. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001) (citing *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994)).  To do so, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about pain; and Plaintiff's educational background, work history, and present age. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  Any conflict in the evidence is to be resolved by the ALJ and not the court. *Newton*, 209 F.3d at 452.

### 1. Objective Medical Evidence

Folorunso was admitted to Ben Taub General Hospital on November 8, 1994, for treatment of

ketoacidosis,[1] stemming from her insulin-dependent diabetes mellitus.[2]  (Tr. at 363).  Reportedly, Plaintiff had been diagnosed in August of that year as suffering from diabetes, and was said to have  been "very compliant to the insulin at home."  (*Id.*).  The records from her hospital admission describe Folorunso  as "obese," with her weight measured at 367 pounds. (*Id.*).  While at Ben Taub, Plaintiff was treated with an intravenous insulin drip, and "her acidosis resolved after about 24-36 hours." (Tr. at 364).  She was discharged on November 11, 1994, and a follow up appointment was scheduled for November 23, 1994. (*Id.*).

The next medical record in the administrative file, however, is from a Harris County Hospital District emergency center, and it is dated July 2, 1995.  (Tr. at 358).  On that day, Plaintiff complained of pain in her lower abdomen.  (*Id.*).  While at the emergency center, she was given five vials of insulin because she reported that she had "run out" of her medication.  (Tr. at 359).  In January 1996, she returned to a county hospital, this time to the out-patient clinic. ("Clinic")  While there, a physician reportedly "reviewed [the] risks" of her diabetes and weight with her, and replenished her supplies of insulin.  (Tr. at 353).  In addition, Folorunso was referred that day for a "diabetic teaching/dietary" consultation in which she was instructed to lose weight and to exercise to help  control her disease.  The notes from that consultation reflect the staff's opinion that Folorunso "needs complete retraining to be sure [she is] following proper protocols," with an "emphasis [on] w[eigh]t loss/glucose control." (Tr. at 352).  In July 1996, Plaintiff returned to the Clinic, this time complaining of dizziness and nausea.  (Tr. at 344).  She admitted to the staff that she had not been following an appropriate diet for one with diabetes.  (*Id.*).  Folorunso was told to return on July 18, 1996, and

---

[1] Ketoacidosis "occurs primarily as a complication of diabetes mellitus and is characterized by … mental confusion, dyspnea, nausea, vomiting, dehydration, and, if untreated, coma.  Emergency treatment includes the administration of insulin and intravenous fluids."  *Mosby's Medical, Nursing and Allied Health Dictionary* 898 (5th ed. 1998).  Dyspnea is "a distressful sensation of uncomfortable breathing."  *Id.* at 527.

[2] Those diagnosed as suffering from diabetes mellitus are "dependent on insulin to prevent ketosis."  *Id.*  at 477.  Ketosis is "the abnormal accumulation of ketones in the body as a result of fats caused by a deficiency or inadequate use of carbohydrates.  Fatty acids are metabolized instead, and the end products, ketones, begin to accumulate … Untreated, ketosis may progress to ketoacidosis, coma, or death."  *Id*. at 899.

when she did so, she was sent to the emergency room because her blood sugar level was dangerously low. (*Id.*). While in the emergency room, Folorunso was given a glass of orange juice, but the staff noted that "patient wants to leave." (Tr. at 345). Apparently she did so, as the next record concerns a return to the Clinic on August 29, 1996. At that time, Plaintiff complained of high blood sugar, as well as tingling, dizziness, and the need to urinate frequently. (Tr. at 340). The medical report from that date reflects that Plaintiff was again counseled on the need to lose weight, to exercise, and to attend a class on a proper diet for diabetics. (*Id.*).

In October 1996, Folorunso was admitted to the hospital for ketoacidosis, and complaints of abdominal pain and nausea. (Tr. at 302-339). Insulin was administered intravenously until her condition "resolved." (Tr. at 305). At that time, Folorunso was also treated for a vaginal yeast infection. (Tr. at 332). On October 17, 1996, a staff doctor met with Plaintiff to discuss  management of her diabetes. He advised her that she needed to educate herself on her condition, and gave her information on available classes. (Tr. at 319). The next day, a different doctor made a notation that she was "extremely obese- she understands that her diabetes may improve markedly with w[eight]t loss." (*Id.*). On October 18, 1996, Plaintiff was discharged from the hospital, only to return to the emergency room two months later, when she was diagnosed with another yeast infection and scabies.[3] (Tr. at 298, 305). Plaintiff's next treatment note is a clinic record dated February 27, 1997. She reported on that date that she had been checking her blood sugar at home, but she was again referred for a consultation about weight loss. (Tr. at 297).

On April 2, 1997, Plaintiff was again admitted to Ben Taub Hospital, suffering from "hyperglycemia"[4] and "possible diabetic ketoacidosis." (Tr. at 273). Her complaints at admission included "light-headedness," and "increased urinary frequency," as well as a continuing yeast infection. (Tr. at 273).

---

[3] Scabies is "a contagious disease caused by …the itch mite, characterized by intense itching of the skin and excoriation from scratching." *Id.* at 1451.

[4] Hyperglycemia is "a greater than normal amount of glucose in the blood. Most frequently associated with diabetes mellitus." *Id.* at 790.

Her medical chart described her as "morbidly obese." (*Id.*).  She was administered an insulin drip and given medication for the infection.  (Tr. at 274).  Folorunso left the hospital the next day, against medical advice, because "she had a previous engagement." (*Id.*).  On discharge, Folorunso was given medication for the yeast infection and insulin for her diabetes.  She was also advised to attend classes on diabetic management and to "consider losing weight for improvement of her glucose intolerance." (*Id.*).

On October 13, 1997, she was treated at the emergency room for two abscesses on her scalp.  (Tr. at 264).  On November 20, 1997,  she did not appear for an appointment at the Clinic, but a note in the medical record details that Plaintiff was "noncompliant" with her medications, had "multiple no shows," and that she "may reschedule [the appointment] if she needs" it.  (Tr. at 263).

Folorunso returned to the emergency room on November 6, 1998, again for treatment of "uncontrolled" diabetes mellitus.  (Tr. at 256).  That day she reported dizziness, blurred vision, increased urine output, and nausea.  (Tr. at 261).  She admitted to the hospital staff that she had been out of insulin for four months.  (*Id.*).  In early March 1999, Plaintiff went to the emergency room twice.  The first time she complained of "pain," "nausea," "vomiting," "dysuria,"[5] and possible "pregnancy."  (Tr. at 252-54).  The second visit, the very next day, she was diagnosed with a urinary tract infection.  (Tr. at 251).  On June 9, 1999, Folorunso went once again to the emergency room, with the complaint that the abscess on her head had returned.  At that time, she was diagnosed as suffering from cellulitis[6] and was given medication to treat that condition.  (Tr. at 248).  Her next visit to the emergency room, on August 24, 1999, was for medications only.  She had to return once more on October 3, 1999,  when it was reported that she was "noncompliant" in taking her insulin, because she had run out.  (Tr. at 240-246, 247).  At that visit, Plaintiff was specifically instructed to walk for thirty minutes, at least five times a week, to take her medications as directed, and to check her

---

[5] Dysuria is "painful urination, usually caused by a bacterial infection."  *Id.* at 528.

[6] Cellulitis is "an acute infection of the skin and subcutaneous tissue characterized most commonly by local heat, redness, pain, and selling, and occasionally by fever, malaise, chills, and headache.  Abscess and tissue destruction usually follow if antibiotics are not taken.  The infection is more likely to develop in the presence of damaged skin, poor circulation, or diabetes mellitus."  *Id.*  at 290.

blood sugar regularly. (Tr. at 241). She was further told to follow the diet recommended by the American Diabetic Association, and to schedule a follow up visit at the Clinic in one week. (*Id.*). Apparently she did not do so, as on December 27, 1999, she went back to the emergency room. This time she complained of "weakness," "visual disturbance," and diabetes. She was given medication, and sent home. (Tr. at 239). Two weeks later, she returned because she had been without medication for two days. (Tr. at 231). She complained of weakness, blurred vision, and nausea, and was treated by an insulin drip. (*Id.*). When she was discharged, she was directed to follow a diet for diabetics, to take her medications as prescribed, and to follow-up at the community clinic in one week. (Tr. at 236).

The next relevant record is from another emergency room visit on May 15, 2000. Again, Folorunso complained of blurry vision, tremors, and lightheadedness, although she admitted that she had not taken her medicine for two months. She was given a supply of insulin, admonished to adhere to the diabetic diet, and to attend diabetic training at the Ben Taub clinic. (Tr. at 224-225). Although Plaintiff did not attend the training class as instructed, she did reschedule her attendance for the following month. (Tr. at 222). Apparently, she did not attend this class, either.

On September 19, 2000, Folorunso returned to the emergency room, reporting vaginal discharge, dizziness, vertigo, and vision problems. (Tr. at 216). It was noted that she had been out of insulin for three months. (*Id.*). Plaintiff was diagnosed with "poorly controlled" diabetes and a yeast infection. Instructions were given to follow a diabetic diet, to walk for exercise, to lose weight, and to wear loose fitting clothes and cotton underwear. (Tr. at 217). She was advised, yet again, to attend the diabetic education classes at Ben Taub. (*Id.*). On December 15, 2000, Folorunso returned to the Clinic, complaining of blurred vision and numbness in her fingers and toes. The attending physician warned, "no more gaining w[eigh]t," and repeated throughout that she must attend a diabetic education class. He also ordered a nutrition consultation. (*Id.*). Apparently, Plaintiff did not attend the class scheduled in January. (Tr. at 210).

Three months later, Folorunso returned to the emergency room, on March 28, 2001, complaining of

dysuria, dizziness, sores on her scalp, and vaginal itching.  (Tr. at 206).  She was diagnosed with "uncontrolled diabetes," and a vaginal infection.  (*Id.*).  She was given insulin and medication for the yeast infection, instructed to take them as prescribed, and to return to the community clinic in two weeks. (Tr. at 204).  She failed to do so.  Instead, she again appeared at the emergency room, on June 12, 2001, suffering from hyperglycemia.  (Tr. at 194).  She reported that she had lost her prescription card and had run out of insulin two months earlier.  (Tr. at 194).  Folorunso was administered insulin and released, with instructions to "please make sure not to run out of your insulin again."  (Tr. at 192).  She was also advised to follow a diabetic diet, and to return to the community clinic in three weeks.  (*Id.*).  Only one week later, however, Folorunso went to the emergency room, complaining of dysuria, frequent urination with a burning sensation, and vaginal sensitivity.  (Tr. at 186).  On that date, she was diagnosed as suffering from genital herpes.  (Tr. at 185).  One month later, she made another trip to the emergency room, this time complaining of vaginal discharge, nausea, and loss of appetite.  (Tr. at 177).  An assessment that day concluded that Folorunso had poor control of her diabetes because "she does not [follow up at] outside clinic."  (*Id.*).  She was again given insulin in the emergency room, and eight units to take with her.  (Tr. at 175-77).  When Plaintiff appeared for a follow up appointment, on July 20, 2001, the record details that, although she had been diagnosed with diabetes in 1994, she "did not follow up for good glucose control."  (Tr. at 174).  The clinic records show that Folorunso failed to keep appointments on three different dates in October 2001.  (Tr. at 171-73).

On January 13, 2002, Plaintiff again went to the emergency room, this time with an abscess on her thigh and another vaginal infection.  (Tr. at 162).  The record shows that she had not taken her insulin that morning, so she was treated for her diabetes, as well as the abscess.  (Tr. at 167).  Folorunso returned on March 15, 2002, because the vaginal infection and abscess had not improved.  (Tr. at 154).  She was treated with insulin, advised to consider surgery for the abscess, to take her medications as instructed, and to check her blood sugars and record the results before each meal.  (Tr. at 157).

Plaintiff returned one week later, complaining of weight gain, "fever," and aches.  (Tr. at 147).  On

that day, she weighed 331 pounds, and was suffering from open, draining abscesses on her scalp.  (*Id.*).  She was treated for the diabetes, given a prescription for Metformin,[7] and referred to the obesity clinic.  (*Id.*).  She failed to keep her scheduled  appointment on April 5, 2002,  but  at a follow up visit to the Clinic on April 12, 2002,  she was again described as an "obese female" in "no acute distress."  (Tr. at 143, 146).  The clinic physician increased her dosage of Metformin and told her to exercise.  (*Id.*).  Plaintiff did not show up for her next appointment, on April 29, 2002, but went to the emergency room two months later, because of "weakness" and "dizziness."  (Tr. at 138, 141).  She acknowledged that she had not been following her treatment and was out of her medications.  (Tr. at 138).  She was given insulin and instructed to follow up at the diabetes clinic later that month.  (Tr. at 134).  Plaintiff did not return to the clinic until October 4, 2002, at which time she complained of headaches, and "back pain with tingling and numbness of both feet."  (Tr. at 123).  On that date, she weighed 354 pounds.  (*Id.*).  On December 6, 2002, Folorunso attended a counseling session at the Harris County Hospital District DKA[8] Clinic ("DKA Clinic").  (Tr. at 517).  The note from that session details Plaintiff's "problems with compliance,"  and a plan was devised to improve her medication routine, to make changes to her diet, and to exercise.  (*Id.*).

Folorunso was admitted to Ben Taub hospital on January 19, 2003, because of a "pilonidal cyst[9]  in the buttocks area."  She was discharged two days later, after she showed improvement.  (Tr. at 490). At a follow up appointment the next month, she admitted that she had been out of insulin for about a week. (Tr. at 466).  Another appointment was scheduled for later that month, but she failed to appear.  (Tr. at 466-67).  Plaintiff did return to the Clinic on April 4,  2003,  complaining of "severe headaches," "nausea," and

---

[7] Metformin is "an antihyerglycemic agent which improves glucose tolerance in patients with type 2 diabetes."  *Physicians' Desk Reference* 605 (59th ed. 2005).

[8] DKA is an abbreviation for diabetic ketoacidosis.  *Mosby's Medical, Nursing and Allied Health Dictionary* at 505.

[9] A pilonidal cyst is "a cyst that often develops in the sacral region of the skin.  …Usually these cysts do not cause any problems, but occasionally …an infection develops …If a cyst becomes infected or inflamed, it is excised, and the space is surgically closed after the infection or inflammation has been effectively treated.  *Id.* at 1266.

"dizziness," and her insulin dosage was increased.   (Tr. at 460).  On June 16, 2003, she returned again because of a vaginal infection.  (Tr. at 451).  The treatment note shows that she was advised to take her medications as prescribed and to return for a follow up on July 3, 2003. (Tr. at 453).  Apparently she did not do so.  The next documented treatment was on August 11, 2003, when Folorunso went to the emergency room to be treated for abscesses on her right buttock, on her left calf, and on her lower right abdomen.  (Tr. at 437). The record shows that her "glucose was not well controlled" at that time.  (Tr. at 439).  She returned on September 26, 2003, with complaints of "vaginal itching," "urinary frequency," "weakness," and to follow up on "diabetes." (Tr. at 432-34).  Folorunso reported that she had two abscesses on her stomach.  (*Id.*).  She was treated with insulin, and released the next day.  (*Id.*).  On October 3, 2003, Folorunso attended another counseling session at the DKA Clinic, and the note details her "very poor diet" and "poor exercise."  (Tr. at 425). Plaintiff returned to the emergency room at the end of the month because of another abscess on her right buttock.  (Tr. at 415).  At that time, other lesions were observed on her "stomach, gluteal area, [and] inner thighs," and she complained of another yeast infection.  (Tr. at 416).  Plaintiff was given medication for the infection, dressings for the abscess, and was told to return for a follow up exam in two days.  (Tr. at 422). There is no data in the administrative record to show that she returned for that appointment.

### 2. Opinions and Diagnoses

In determining the sufficiency of the evidence to support an ALJ's decision, the court must consider any diagnoses or expert opinions, from treating and examining physicians, on subsidiary questions of fact. "[O]rdinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability."  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  It is the ALJ's duty, as fact finder, to determine the credibility of the medical reports and the testimony given by treating doctors.  *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  In this instance, the ALJ not only reviewed the records from the emergency room and clinic physicians, but also the opinions from the SSA's non-examining medical consultant, Dr. G. Wik, and the testimony from a medical expert witness, Dr. Giao N. Hoang.  (Tr. at 14).

13

That opinion and testimony are summarized below.

On September 11, 2002, Grethe E. Wik, D.O., conducted a residual functional capacity assessment, on behalf of the SSA.  Dr. Wik never examined Plaintiff, and his assessment was based on a review of her medical file, only.  (Tr. at 114).  From his review, Dr. Wik found that Plaintiff could lift and carry items that weigh up to 25 pounds frequently, and could occasionally lift and carry items weighing up to 50 pounds.  (Tr. at 115).  He found that she can stand, sit, or walk for about six hours in an eight hour work day, and that she had an unlimited ability to push and pull.  (*Id.*).  Dr. Wik found further that Folorunso had no limitations on her ability to balance, stoop, kneel, crouch or crawl.  (Tr. at 116).  He concluded that Plaintiff's symptoms were attributable to a medically determinable impairment, but that her "alleged limitations" were "not fully supported by [the] MEOR [and] other evidence."  (Tr. at 119).

At the administrative hearing, Dr. Giao Hoang testified as a medical expert witness.  (Tr. at 558).  Dr. Hoang stated that, based on his review of the medical evidence available, Folorunso suffers from "insulin-dependent diabetes," but that she did not meet the disability listing[10] for that disease.  He explained that his opinion stemmed from the absence of any evidence to show motor neuropathy, frequent acidosis, or retinitis.[11]  (Tr. at 558).  Dr. Hoang testified that to meet the listing because of the presence of neuropathy, there must be evidence that a motor impairment has "render[ed] her unable to ambulate."  (Tr. at 558).  No such evidence was present in Folorunso's medical history.  He also pointed out that, in the last ten years, Plaintiff had only

---

[10] A claimant may be considered disabled by diabetes if they have been diagnosed with one of the following conditions:

A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station; or
B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels); or
C. Retinitis proliferans.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 9.08.

[11] Retinitis is "an inflammation of the retina."  *Id.* at 1414.

three hospital admissions due to acidosis, each one of short duration.  This, he explained, defeats a disability

listing, as well.  Finally, he observed that there was no evidence of retinitis in her treatment history.  While

Dr. Hoang did note the instances of diabetic ketoacidosis in her records, he concluded that, given her

diagnosis of diabetes, "she is prone to ketoacidosis if she does not take her insulin."  (Tr. at 559).  In addition

to diabetes, Dr. Hoang found that Plaintiff suffered from hypertension and "marked obesity."  (Tr. at 560).

In his testimony, he also commented on the numerous notations in her medical record documenting

Folorunso's failure to comply with her medication regimen or follow a diet appropriate for a diabetic.  (Tr.

at 562-64).  From this evidence, Dr. Hoang surmised that, at those times, Plaintiff was not taking her insulin

as prescribed, and that this resulted in the development of abscesses.  (Tr. at 563).  He explained that, in

August 2003, for example, when Folorunso was suffering from multiple abscesses, she was being told

repeatedly to lose weight, to control her sugar, and to improve her diet.  (Tr. at 563).  Dr. Hoang testified that

it is clear that the abscesses occurred when Plaintiff was non-compliant with medical instructions.

Dr. Hoang was then questioned by Folorunso's attorney, and the following exchange took place:

Q:  She was taking her medication, but her diet was poor.  Is that the bottom line?

A:  Well, we don't have the report about the dose of [sic] level of [INAUDIBLE] to tell me
if she was taking the insulin or not.  But I see that she was seeing, you know, September,
October—August, September, and October she was seen, because she has problems with,
you know abscess.

(Tr. at 564-65).  He continued that "[i]t seems she does not follow the [doctor's] advice unless she has a

problem.  And when she has a problem she has to take care of it."  (Tr. at 565).  The attorney then asked Dr.

Hoang about Folorunso's ability to sit or stand following treatment for the abscesses on her buttocks:

"During that time period, do you think she could have—let's say from August of '03
[INAUDIBLE], do you think she could have sat as long as she'd like to?
Or six hours a day, two hours a day?"

(Tr. at 566).  Dr. Hoang responded that Plaintiff would need about "three days" to recover from the treatment

before she could "be ambulating again."  He testified further that this estimated recovery time depended on

15

the location of a abscess, and whether she could shift her weight to avoid aggravating it when sitting.  (*Id*.).  He explained that pilonidal cyst surgery, on the other hand, required as much as two weeks, or longer, to recover from, because it was not a surface infection as the abscesses were.   (Tr. at 566-67).  Dr. Hoang explained further that Plaintiff's nausea, dizziness, and headaches, were all symptoms of diabetes, and that "when you have increased sugar, it makes you feel crummy…." You may have "blurred vision." "And when you magnify those symptoms, …you might have severe headaches."  (Tr. at 569-70).  In sum, Dr. Hoang testified that "[w]hen the patient has uncontrolled diabetes, the blood sugar is very high, there's a very high risk of [skin] infection."  (Tr. at 572).

From his review of the evidence,  Dr. Hoang concluded that Plaintiff was able to work, because she would have no "difficulty lifting 25 pounds frequently, and 50 pounds occasionally."  However, he did say, that because of her severe obesity, "she might have problems standing and walking, for more that two or three hours a day, in an eight-hour day. "  (Tr. at 560)

### 3. Plaintiff's Educational Background, Work History, and Present Age

At the time of the administrative hearing, Plaintiff was 33 years old, and she reported that she had completed the ten grade, without the aid of special education classes.  (Tr. at 86).  Folorunso stated that she had never obtained a GED or vocational training.  (Tr. at 83).  At the hearing, she told the ALJ that she had been employed in the past as a part-time home health caretaker, at a fast food restaurant and at a washateria.  (Tr. at 548).

### 4. Subjective Complaints

To determine Plaintiff's capacity to work, the ALJ also considered her subjective complaints.  (Tr. at 15).  At the hearing, Folorunso testified that she took her medications as prescribed, and that "sometimes" they helped, but "sometimes not."  (Tr. at 551).  She told the ALJ that she had to stop work because her blood sugar had been so high "it made me jittery," and required frequent use of the bathroom which interfered with her duties.  (Tr. at 549).  She testified further that she began to develop abscesses,  which have required

16

emergency room visits to get "them lanced."   Plaintiff testified that, previously, she would develop only a single abscess at a time, but then "I'll get like maybe two, maybe three at one time.…maybe four."  (Tr. at 550).  The ALJ then asked, "how many times do you think you've had to go into the ER or the hospital to have those cleaned up or lanced or whatever?"  Plaintiff replied, "[m]aybe four or five months. And within a month I would say, every other week."  (Tr. at 50).

Folorunso testified that when an abscess appears, she lies in bed all day, on the "opposite side."  (Tr. at 552-53).  She told the ALJ that she cannot sit in one position for more than "30 or 45 minutes," and that she cannot walk for any distance without getting dizzy.  (Tr. at 556).  Finally, Folorunso testified that she still suffered from headaches, dizziness, and nausea, and that if she does not elevate her legs, her feet will swell.  (Tr. at 552, 556).  In regard to her daily activities, Folorunso testified that she does not have a driver's license, and that her roommate does all of the grocery shopping and housecleaning.  (Tr. at 553).

The ALJ then considered evidence from Caroline Fisher, a vocational expert witness ("VE"), to determine whether there was work available to Plaintiff if she was unable to return to her past employment.  Fisher testified that Folorunso had relevant work experience has a home health attendant, which is classified as a medium, unskilled job, and in a laundry, which is also classified as medium and unskilled.  Fisher testified that Plaintiff's previous employment as a fast food worker was light and unskilled labor.  (Tr. at 573).  The ALJ then asked Fisher the following hypothetical question, based on his findings on the credible evidence:

> Assume that we have an individual that could stand no more than about two hours, in an eight-hour workday.  She could sit for about six hours.  She could lift 20 pounds frequently, up to 50 pounds, occasionally…Would such an individual be able to perform the Claimant's past relevant work?

(Tr. at 573-74).  Fisher replied that a person with those limitations, as stated, could not perform any of Folorunso's past jobs.   However, she stated that, with Plaintiff's "age, education, and work history," she would be able to perform "a whole range of sedentary, unskilled jobs" that are available in the national economy.  (*Id.*).  Plaintiff's counsel then cross-examined Fisher, and posed the

17

Case 4:04-cv-03183   Document 15   Filed in TXSD on 02/16/06   Page 18 of 25

following hypothetical question:

> If an individual had the number of abscesses as Dr. Hoang described earlier,
> would an individual be able to maintain any type of competitive employment?

(Tr. at 574).  Fisher responded that it would "depend[] on the length of employment that a person's had, with

an employer."  She then explained that

> [A] new hire — who misses a week every two months, say during the first six months of
> employment, would result in termination.  If it's a long term employee, who's been there 15
> years, and this is an acute situation, that happens one week, every two months, for two to
> three months, that person may not be terminated, maybe.  So it just — it depends on the
> circumstances of the employment, really.

(Tr. at 575).

Based on the evidence presented, the ALJ found that Plaintiff's statements concerning her

impairments "do not support the degree of pain and functional limitations which the claimant alleges."  (Tr.

at 15).  He found further that, from the available evidence,  Plaintiff had the residual functional capacity to

perform the full range of sedentary work.  (*Id.*).  With that finding, he denied her claim for disability benefits.

Folorunso complains, however, that the ALJ erred in evaluating the evidence in a number of ways.

Her first area of complaint centers on the contention that the ALJ did not consider the impact of her weight

on her ability to work.

### *Functional Impact of Obesity*

Plaintiff argues that the ALJ erred because he failed to discuss in his decision, or even consider, the

severity and functional impact of her obesity, in determinating her residual functional capacity.  (Plaintiff's

Memo at 4).  Folorunso points out that the evidence shows her body mass index (BMI) to be over 50, which

well exceeds "Level III," the highest level of obesity.  (*Id.* at 5-6).  She argues that, because of her weight,

she is more likely to be seriously limited in her activities than someone with a lower BMI.  (*Id.*).  She

complains that these limitations were not properly considered by the ALJ prior to his finding that she is not

disabled.   In response, the Commissioner points out that the ALJ expressly noted Plaintiff's obesity, at the

outset of his opinion, and that his decision reflects his findings on the impact of her obesity, separately and in combination with her other impairments. (Defendant's Memo at 3).  More importantly, the Commissioner emphasizes that there is no evidence  to suggest that Plaintiff's obesity has resulted in any functional limitations.

Clearly, "[t]he law of this Circuit requires consideration of the combined effect of impairments." *Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000).  It is error for an ALJ to evaluate the consequences of a claimant's individual impairments separately without regard to  their combined effects.  *Id*.  (citing *Scott v. Heckler*, 770 F.2d 482, 487 (5th Cir. 1985); *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)).  "The Act seeks to administer relief to the whole [wo]man, and not simply to serve as a vehicle for the separate clinical analysis of individual ailments."  *Scott*, 770 F.2d at 487 (quoting *Dorsey v. Heckler*, 702 F.2d 597, 605 (5th Cir. 1983)).  If an ALJ finds that "a medically severe combination of impairments" exists, after a review of the record as a whole, then "'the combined impact of the impairments will be considered throughout the disability determination process.'"  *Loza*, 219 F.3d. at 393 (quoting 20 C.F.R. § 404.1523).   It is important to emphasize, however, that Folorunso has the burden to prove any disability that is relevant to the first four steps of the ALJ's analysis.  *Wren*, 925 F.2d at 125.  Absent such proof, a court should not disturb an ALJ's "determination that these impairments were not disabling."  *Id*.

Other than providing her height and weight in the application for benefits, Folorunso did not supply any information on how obesity limits her abilities.  In fact, she did not claim obesity as a disabling impairment in her SSA benefits application.  Nor did she raise any evidence at the hearing on physical limitations imposed by her size.  However, even in the absence of any claim or evidence, the ALJ made special note of Folorunso's weight in his decision.  After observing that obesity had been deleted from the applicable SSA disability listings, he expressed his intention, nevertheless, to consider the effects of Folorunso's weight, alone, and in combination with her other impairments,  in deciding her "ability to perform daily living and work activities."  (Tr. at 14).

19

First, he concluded that Plaintiff did suffer from "severe" impairments of diabetes, hypertension, and abscesses. (*Id.*).  He evaluated the effect of these multiple impairments on her ability to function, and determined that, from the record and the testimony at the hearing, Folorunso is able to perform sedentary work. (Tr. at 14).  In making that determination, the ALJ  relied on the residual capacity assessment which was prepared, by Dr. Wik.  (Tr. at 114).  Dr. Wik acknowledged that Folorunso had been referred to an obesity clinic, but he still found that she could meet the exertional demands of a sedentary job.  (Tr. at 115-16).  The ALJ also had the benefit of  Plaintiff's testimony in which she detailed the limitations imposed by her diabetes and its complications, but raised no limitation as a consequence of her weight. (Tr. at 549-553).  Indeed, at the conclusion of her testimony, the ALJ prompted her to name any other problems that interfered with her physical abilities.  Folorunso gave no testimony, at all, about her obesity.

> Q:  I just want to make sure we haven't left anything out. Can you think of anything else that's important, for the Court to know, that we haven't talked about already, today?
>
> A:  Not really. They just told me that I was diabetic with high blood pressure.

(Tr. at 557). Finally, the ALJ  relied on Dr. Hoang's testimony that, "because of [Plaintiff's] severe obesity, she might have problems standing and walking, for more than two or three hours a day, in an eight-hour day." (Tr. at 560).  Though not required to accept that assessment, the ALJ did so.  In an abundance of caution, he incorporated those limitations into his hypothetical question to the vocational expert witness.  In his written decision, the ALJ found Plaintiff's abilities limited to sitting for six hours, with normal breaks, standing for 2 hours in an eight hour workday, and  lifting no more than ten pounds, on a frequent basis.  (Tr. at 16).  On this record, the ALJ clearly considered the combined effect of all of  Plaintiff's impairments, claimed or not. *See Loza v. Apfel*, 219 at 399 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987).  Accordingly, it is RECOMMENDED that Plaintiff's motion for summary judgment, on this issue, be DENIED.

### *Failure to Follow Treatment*

Plaintiff next complains that the ALJ violated S.S.R. 82-59 when he found that she willfully failed

to follow her prescribed treatment and denied her claim.  (Plaintiff's Memo at 7).  She insists that any failure to abide by treatment indicates a "difficulty in understanding what is required of her and the consequences of her inability to comply with such self-care."  (*Id.* at 8).  For this reason, she contends that, at most, the evidence has shown that she did not follow the treatment, and not that she refused to do so.  In response, the Commissioner points out that S.S.R. 82-59 applies only in those cases in which an ALJ has found that a disabling impairment exists.  As that circumstance is not present here, that regulation is not relevant to his decision.  (Defendant's Memo at 5).

It is true, as the Commissioner notes, that S.S.R. 82-59 states that

An individual who would *otherwise be found to be under a disability*, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability.

That regulation is intended to express "the policy and describe the criteria necessary for a finding of failure to follow prescribed treatment when evaluating disability under titles II and XVI of the Social Security Act and implementing regulations."  S.S.R. 82-59, 1982 WL 31384 at *1.  As such,  "[i]ndividuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment."  (*Id.*) (emphasis added).  It is clear, then, that this regulation applies only if the claimant has first been determined to be disabled.  In the case of a disability finding, the regulation allows benefits to be denied because of a claimant's failure to follow the prescribed treatment.  Here, the ALJ did not find that Folorunso is disabled, and so S.S.R. 82-59 does not govern his decision.

In any case, however, before benefits will be awarded, a claimant "must follow" any prescribed treatment that can restore the ability to work.  *See* 20 C.F.R. 404.1530.  If the prescribed treatment is ignored, without good reason, a denial of benefits is proper.  *Id.*; *Johnson v. Sullivan*, 894 F. 2d 683, 685 (5th Cir. 1990).  Good reasons for a failure to follow the prescribed treatment include "physical, mental, educational, and linguistic limitations." 20 C.F.R. 404.1530(c).  And, it is well-settled that to prevail on a disability claim,

21

despite evidence of non-compliance with treatment, a claimant must show that she "would be disabled with or without regular medical treatment." *Villa*, 895 F. 2d at 1024.

Here, Plaintiff's history of non-compliance with repeated medical instructions is apparent throughout the records. There is ample evidence to show that Folorunso has repeatedly let her medication lapse, once for as long as four months, yet sought no additional supplies until resulting complications required emergency treatment. (Tr. at 194, 216, 225, 242, 261, 466). In December 2002, for example, one month before her pilonidal cyst surgery, Plaintiff was observed to have "problems with compliance." (Tr. at 517). One month after this surgery, she admitted that she had gone one week without insulin. (Tr. at 466). Tellingly, during the period from August through October 2003, when Folorunso suffered from multiple abscesses, the medical records show that her "glucose was not well controlled," that she "needed to control [her] sugar," and that she had a "very poor diet." (Tr. at 425, 436, 439). Indeed, Dr. Hoang testified that, in his opinion, these chart notes, and Plaintiff's history of recurring infections and abscesses, point to her lack of compliance with diabetes treatment. (Tr. at 563).

On this record, it is indisputable that Plaintiff did not take her prescribed medication on numerous occasions. And despite Plaintiff's insistence that she "lacks the psychological wherewithal to comprehend the consequences of her inaction," there is no evidence that suggests a "good reason" for that non-compliance. In fact, the evidence shows that sometimes Plaintiff was duly compliant, and took her medication as required. For example, in 1997 she reported often that she had been "checking her blood sugar at home," as instructed. (Tr. at 298, 363). Interestingly, Plaintiff told the ALJ at the administrative hearing that she did follow her medical instructions, and never testified to any inability to do so. (Tr. at 551). The records are likewise clear that Folorunso was warned, repeatedly, not only on the risks of diabetes and excess weight, but also on the consequences of her non-compliance. For that reason, on this record, the ALJ is "not precluded from relying upon lack of treatment as an indication of nondisability." *Villa*, 895 F.2d at 1024; *Hollis v. Bowen*, 837 F.2d 1378 (5th Cir. 1988).

22

Accordingly, it is RECOMMENDED that Plaintiff's motion for summary judgment, on this ground, be DENIED.

***Plaintiff's Skin Infections***

Finally, Plaintiff argues that the ALJ did not fully consider the medical complications resulting from her diabetes, in particular, the discomfort from the recurring abscesses to which she is prone.   Folorunso points out that these painful, recurrent abscesses and yeast infections impact her ability to perform work activities, including walking, standing, and sitting.  (Plaintiff's Memo at 7).  The Commissioner contends that the ALJ properly relied on the testimony from the medical expert, which showed that, in spite of those complications, Plaintiff is able to perform sedentary jobs.  (Defendant's Memo at 6).

To establish whether any of Plaintiff's symptoms, including pain from her skin infections,  would limit her ability to work, an ALJ must consider the claimant's subjective complaints "about the intensity, persistence, and limiting effects of [her] symptoms, and . . . will evaluate [her] statements in relation to the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4); *and see Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994) ("[T]he law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.").  Indeed, "[t]he Act, regulations and case law mandate that . .  subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988).  For this reason, an ALJ may reject a claimant's subjective complaints, as long as the reasons for so doing are made clear.  *Falco*, 27 F.3d at 164.  For example, he may find that the claimant's subjective complaints were "exaggerated and not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony."  *Id*.  This circuit recognizes that "the ALJ is best positioned" to make these determinations because of his opportunity to observe the claimant first-hand, and so an ALJ's credibility findings on a claimant's subjective complaints are entitled to substantial deference.  *Scott v. Shalala,* 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco,* 27 F.3d at 164; *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).  Those things that must be considered include daily activities, aggravating factors, any treatment

23

received, any measures used to relieve pain or other symptoms, and any other factors concerning a functional limitation.  *See* 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ acknowledged Folorunso's testimony that she suffers from recurrent, painful complications of her diabetes.  (Tr. at 15).  He noted, in particular, her testimony that she gets abscesses "on her bottom," and has to "go to the emergency room to get the [abscesses] lanced.  She spends all day laying down.  She can sit for 30-45 minutes and walk for short distances." (Tr. at 15).  The ALJ then observed that the issue "is the degree of pain or other subjective symptoms which the claimant experiences."  (Tr. at 15). He concluded that "it is possible that with compliance of medication and treatment the claimant's diabetes could be brought under control."  He then found that Plaintiff's testimony was "unsupported by the objective findings and not credible to the extent alleged."  (Tr. at 16).  In making this decision, the ALJ pointed to numerous instances in which Plaintiff did  not take her medication as instructed, which belies the claim that she did follow her treatment instructions.  (Tr. at 14).  He further commented that Plaintiff's hospitalizations had been brief, and that she seldom returned for required follow up unless another medical emergency arose. The ALJ pointed out that, even when Folorunso did schedule a follow up appointment, she rarely kept it.  (Tr. at 15).  Finally, he considered Folorunso's stated "daily activities," and found them to lack credibility and elude verification.  From the record, it is clear that the ALJ considered Folorunso's medical complications, and found that her claimed limitations were "not credible to the extent alleged." *Falco*, 27 F.3d at 164. The record is similarly clear that Folorunso rarely followed her prescribed diabetes treatment, including regular insulin, appropriate diet, and weight control .  On this record, as a whole, the ALJ did not err in his finding that Plaintiff is not disabled.  *See Villa*, 895 F.2d at 1024.  Accordingly, it is RECOMMENDED that Plaintiff's motion for summary judgment, on this issue, be DENIED, and that Defendant's motion be GRANTED.

**Conclusion**

24

Based on the foregoing, it is RECOMMENDED that the motion for summary judgment by Plaintiff Claudia L. Folorunso be DENIED, and that the motion by Social Security Commissioner Jo Anne B. Barnhart be GRANTED.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 80-5, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, room 11535, **and** to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this  16th  day of February, 2006.

MARY MILLOY
UNITED STATES MAGISTRATE JUDGE